UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION AT PIKEVILLE

| | |
|---|---|
| BOBBY TAYLOR, )<br>)<br>Plaintiff, )<br>v. )<br>)<br>SOUTHWIRE TOOLS & EQUIPMENT, )<br>)<br>Defendant. )<br>) | Civil Action No. 7:14-CV-00175-ART<br><br>**Electronically Filed** |

## MEMORANDUM IN SUPPORT OF SOUTHWIRE'S
## MOTION TO EXCLUDE PLAINTIFF'S EXPERT

This is a product liability case arising from a November 1, 2013 mining accident. Plaintiff was using a Southwire Model 11060S Multimeter to measure voltage on a 995-volt circuit when an arc flash occurred. Unfortunately, Plaintiff was not wearing the required personal protective equipment so his hands were burned. Plaintiff's liability expert is John Pfeiffer, an electrical engineer. However, Pfeiffer's liability and causation opinions do not comport with Rule 702 or *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993), and must be excluded. Pfeiffer's proposed testimony implicates the following propositions:

### Proposition No. 1

**A purported expert adopts the preliminary opinion of MSHA, yet ignores that MSHA subsequently determined—based on the results of its referral for further testing by a superb compliance testing laboratory—that its preliminary opinion was incorrect. Is it a valid or reliable methodology for an expert to ignore the testing results and cling to the discredited preliminary opinion when the expert did no testing of his own?**

Pfeiffer's main theory is that the strength and spacing ("clearance") between MOV components in the multimeter was inadequate, thus causing the device to be incapable of working at its rated capacity. (Pfeiffer Report at 33, 39-40, attached as Exhibit A). Pfeiffer did not do his own studies in this area, but solely relied on the initial findings of an incident

investigation by the Mine Safety and Health Administration ("MSHA") that "[t]he fault path through the MOCs at the maximum nominal voltage as stated in the UL61010-1 2nd edition Standard and the clearance distances measured on the gerber file and the PCBs indicate the multimeter does not meet the requirements of the Standard to which it was certified." (March 7, 2014 MSHA amended Investigative Report at 14, attached as Exhibit B). However, MSHA's amended report reflects that it referred those issues for further testing and analysis to Underwriters Laboratory ("UL"), the nationally recognized compliance testing organization that developed the UL61010-1 2nd edition Standard referenced by MSHA, and had earlier approved the design of this multimeter. (*Id.* at 7, 20). UL conducted laboratory testing on the multimeter and reported back to MSHA that "all issues raised in [MSHA's] report were consider and/or/ resolved." (*Id.* at 20). Specifically, UL "[c]oncluded that the clearances within the meter were adequate for the rating" and did not produce arcing in laboratory testing. (*Id.,* subpart 3). Accordingly, MSHA's final report found that its earlier conclusion "***is not correct and should be deleted***." (*Id.* at 20 (emphasis supplied)). Pfeiffer utterly ignored in both of his reports the contrary conclusion of MSHA and the testing and analysis of UL, and relied instead on the preliminary conclusion that MSHA had specifically deleted as incorrect.

### **Proposition No. 2**

**Can an expert testify to an opinion he has not even formed yet, when it is irrelevant to the case, when he does no compliance testing, has no expertise in such testing, and does not even have the equipment to do such testing, and when his testimony is contradicted by two testing laboratories that actually *did* do the compliance testing at issue?**

Pfeiffer does not have the expertise or laboratory setup to challenge the actual UL testing that he ignored in his reports. (R. 20, Pfeiffer Dep. at 44:13-21, 47:12-22, 179:22–184:24). Indeed, he admitted that he has not even been able to form an opinion about the UL testing because he did not request or receive sufficient information from Plaintiff's counsel. (*Id.* at

- 2 -

68:9–69:3, 184:4-24).[1]  During his deposition, Pfeiffer admitted that his true concern is challenging UL's standard to the extent it allows for 0.2 mm clearances.  (*Id.* at 159:14-25, 183:20–184:15, 187:6-19).  However, he has no particular expertise to challenge that standard, has not done any testing of his own to prove his theory, and has not subjected his as-yet-unformed opinions to peer review or had them validated by any other expert.  (*Id.* at 44:13-21, 161:23–162:15, 179:22–185:15).  Even worse, his concern about the 0.2 mm clearance issue is completely irrelevant because none of the clearances on this device were that small.  (*Id.* at 186:24–187:19).  The smallest clearance addressed in the MSHA report was 7 mm, and "UL reported that an arc did not occur across the 7 mm space that is shown on page 10 during their testing" even though the "voltage across this 7 mm space would have been the full test voltage." (Ex. B at 20, subpart 3).  Pfeiffer's pet peeve about UL's 0.2 mm standard is irrelevant.

## **Proposition No. 3**

**Is it a valid and reliable methodology for an expert to form an opinion without requesting or reviewing obvious and readily available factual information that destroys the opinion, and then—when advised of the contrary facts—to cling to the opinion regardless?**

Pfeiffer's causation theory posits that Plaintiff set the multimeter on top of the power receptacle he was testing and that conductive materials were blown down across the terminals of the receptacle, causing an arc flash that injured Plaintiff.  (Ex. A at 4).  Pfeiffer agreed that his theory would fail if Plaintiff had set the multimeter beside the receptacle instead of on top.  (R. 20 at 88:12-21, 111:16–112:4, 200:23–201:3).  However, he was completely unaware that Plaintiff had weeks earlier testified under oath that he placed the multimeter on a shelf ***below*** the receptacle and ***about a foot to the right*** of the receptacle.  (*Id.* at 86:9-23; R. 19, Taylor Dep. at

---

[1] Nor had Pfeiffer even asked whether any independent testing had been done to analyze whether the device could withstand voltages above its rating.  He was unaware of independent laboratory testing by ACS that found the device withstood voltages as much as 50% above its rating. (Rose Report at 7-8, 15 and Appendix I, attached as Exhibit C).  Thus, there are two laboratory studies by acknowledged testing experts that destroy his strength of component theory.  He addressed neither study, and did no testing of his own.

- 3 -

42-43).[2] Plaintiff testified that his common practice is to set the meter to the side, as far away from the receptacle as the leads will permit, so that they do not get in the way. (R. 19 at 40-43).[3] He even drew the location on a picture at his deposition, which clearly shows that he did **not** put the multimeter on top of the receptacle. (*Id.*; Diagram of Power Center (Exhibit 2 to Taylor Deposition), attached as Exhibit E). Rather than considering that Plaintiff's consistent testimony destroyed his opinion, Pfeiffer argued that Plaintiff must be mistaken as to where he set the multimeter. (R. 20 at 87:2-13 ("So I think he was mistaken in what he said. You're quoting Mr. Taylor. I don't believe that was what he did."); *id.* at 201:4-10).

Pfeiffer displayed the same faulty "methodology" in forming his opinion that, because the device failed a "watertightness" test conducted by UL, the accident must have been caused by the ingress of humidity and dust into the device. (Ex. A at 40).[4] He grudgingly admitted his opinion was based on speculation, as he did not visit the Excel Mine or do anything to determine the specific level of dust or humidity in the area where the accident occurred. (R. 20 at 126:9–128:5). Pfeiffer was also unaware that Plaintiff testified that he removed the device from its packaging two months before and immediately put it inside its "weatherproof case." (*Id.* at 137:9-24; R. 19 at 26). The device was never outside of its case or exposed to any amount of water. (R. 19 at 26-28). Moreover, Plaintiff testified that the first time he used the device was for the testing at issue (*id.* at 24-25), and all surfaces in the room were dry. (*Id.* at 34-35). There

---

[2] Plaintiff's deposition testimony is consistent with his contemporaneous statement to MSHA that he "used the little stand on the back of the meter to stand the meter up **beside of the receptacle** where I was going to get my voltage reading." (MSHA preliminary Report of Investigation at 19, attached as Exhibit D (page numbers and emphasis added)).

[3] If Pfeiffer had been correct about the location, the test leads would have been directly in the path of the arc flash and should have been melted (which they did not). (Ex. C at 4, subpart 5). Ignoring Plaintiff's actual testimony, Pfeiffer attempts to avoid this logical flaw in his theory by speculating that Plaintiff threw the test leads to the side when the accident occurred. (R. 20 at 90:7–91:2).

[4] The watertightness test places the device under 27 inches of water for over 28 minutes and then checks for water infiltration inside the device. Pfeiffer acknowledged that the pressure on the device in that test is not even comparable to a humid atmosphere. (R. 20 at 135:19–136:16).

- 4 -

is no evidence that moisture or dust came into contact with the multimeter. Even then, Pfeiffer did not conduct any sort of methodological test to determine if humidity or dust could have infiltrated the device in any case. His opinion is complete speculation.

### Proposition No. 4

**Does an electrical engineering vocation imbue one with expertise to opine on manufacturing or design defects or the validity of compliance standards when the purported expert is not sought out as an expert in those areas, has no direct expertise, has not published anything in peer-reviewed literature, and has done no specific methodological study or research?**

Pfeiffer's background relates to electrical engineering. (R. 20 at 115:14-25). Nothing in his education, professional experience, publications, or presentations indicates any expertise in design of products for manufacturing. (Pfeiffer CV, attached as Exhibit F). He has never performed an investigation into an electrical accident involving a multimeter and he acknowledged that he has no expertise regarding the design or manufacturing of multimeters or anything comparable. (R. 20 at 21:1-17, 24:17-24, 31:2-9, 53:14–54:8). He also has no identifiable experience in the field of compliance testing, and testified at his deposition that he does not have a laboratory in which to conduct such testing. (*Id.* at 31:10-21, 44:13-21, 47:12-22). Pfeiffer's report and testimony fail to establish any specialized knowledge or experience in the field of product design, the manufacturing of multimeters, or compliance testing.

### ARGUMENT

Rule 702 resoundingly rejects the foregoing propositions because it requires Plaintiff to prove that "(1) the testimony is based upon sufficient facts and data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702; *Daubert,* 509 U.S. at 589, 592 n.10.

In *Daubert*, the Supreme Court explained that Rule 702 places a special gatekeeping obligation upon a trial judge to "ensure that any and all scientific testimony or evidence admitted

is not only relevant, but reliable." 509 U.S. at 589, 597; *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999) (expanding the gatekeeping obligation to "testimony based on 'technical' and 'other specialized knowledge.'"). *Kumho Tire* concluded that Rule 702

> … requires a valid connection to the pertinent inquiry as a precondition to admissibility. And where such testimony's factual basis, data, principles, methods, or their application are called sufficiently into question the trial judge must determine whether the testimony has a reliable basis in the knowledge and experience of the relevant discipline.

*Id*. at 149. To accomplish this goal, the gatekeeper must look beyond the expert's "qualifications" to examine the methodology underlying the expert's opinions. *Id.* at 153-54. Even where an expert's opinion is well grounded in a reliable methodology, the gatekeeper court must further determine that the opinion is grounded in the facts so as to be useful to the jury, i.e., whether the expert's testimony "fits" the facts of the case.

The Sixth Circuit has recognized that a trial court's "discretion is not unbridled," but it is afforded "wide latitude to determine the admissibility of expert testimony under *Daubert*." *Hardyman v. Norfolk & W. Ry. Co.*, 243 F.3d 255, 267 (6th Cir. 2001); *see also Meridia Prods. Liab. Litig. v. Abbott Labs.*, 447 F.3d 861, 868 (6th Cir. 2006); *Brainard v. Am. Skandia Life Ins.*, 432 F.3d 655, 663 (6th Cir. 2005). A court's inquiry under Rule 702 is, ultimately, "a flexible one" and, although the focus "must be solely on principles and methodology, not on the conclusions they generate," *Daubert*, 509 U.S. at 594-95, the Supreme Court recognizes that "conclusions and methodology are not entirely distinct from one another." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

The Sixth Circuit instructs that an expert opinion is admissible if it satisfies three prerequisites: "First, the witness must be qualified . . . Second, the testimony must be relevant, meaning that it 'will assist the trier of fact' . . . Third, the testimony must be reliable." *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 528-29 (6th Cir. 2008). Pfeiffer fails each prong.

DY47:45478:562053:3:LEXINGTON

1.  **Pfeiffer's Testimony Is Outside the Scope of His Qualifications.**

A witness must be qualified in the relevant field in order to testify as an expert, and significant education, training, or experience in one field does not equate to equal qualifications in a similar, but different field. *Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 478 (6th Cir. 2008). In *Sigler*, the expert sought to testify about the speed a car was traveling at the time of an accident and the cause for the airbag's failure to deploy. Although well qualified in automobile mechanics, the expert was excluded because "his qualifications do not suggest he is an expert in physics, accident reconstruction, or airbag engineering." *Id.* at 479. The Sixth Circuit affirmed, finding the expert's proposed testimony was outside of the scope of his qualifications. *Id.*

Pfeiffer's background relates to electrical engineering. (R. 20 at 115:14-25). However, Pfeiffer's central opinions require expertise in areas for which he has none: compliance testing, developing compliance standards, product design, and product manufacturing. He carries none of the indicia of true expertise in these areas – no testing, no scholarly works, no peer presentations, no testifying, no advertising of expertise, no recognition of expertise in the field, no depth of practical experience, etc. (*See id.* at 14:3-10, 21:1-17, 24:17–25:6, 31:2-21, 44:13–45:4, 47:12-22, 53:14–54:8). His report and testimony fail to establish any specialized knowledge or experience in those areas. (*See* Ex. A). While he has a few experiences at the edges of these areas, he simply does not have the depth of training or experience that would make him a valid expert in these areas, particularly as compared to compliance and testing laboratories like UL that are relied upon nationally. Pfeiffer admits he has not developed expertise in the field of compliance testing for manufacturers. (R. 20 at 31:2-21, 44:13–45:4). Indeed, he testified at his deposition that he does not even have a laboratory in which to conduct such testing. (*Id.* at 44:21–45:4, 47:12-22). He has not investigated an accident involving a multimeter, and does not have expertise regarding the manufacturing or design of multimeters

- 7 -

"or of anything really comparable." (*Id.* at 11:6-9, 21:1-17, 24:17-24, 31:2-9, 53:14–54:8). Nor does he hold himself out to the scientific or technical community as an expert in manufacturing or design of any product. (*Id.* at 21:1-17, 24:17–25:6, 53:14–54:8). As in *Sigler*, Plaintiff attempts to extend Pfeiffer's testimony to subjects for which he is not qualified. The Court should exclude any testimony on topics outside of his general expertise in the field of electrical engineering.

### 2.  Pfeiffer's Testimony Will Not Assist the Trier of Fact.

To be relevant, expert testimony must both relate to an issue in the case and also "help the jury evaluate evidence it could not effectively judge on its own." *United States v. Stapleton*, No. 12-11-ART, 2013 U.S. Dist. LEXIS 160442, at *10 (E.D. Ky. Nov. 8, 2013). Expert testimony is only admissible if the "lay jurors could not, without assistance, fully piece together" the facts of the case. *Id.* at *11. In several respects, Pfeiffer's opinions fail this test.

Pfeiffer's opinion is based solely on the findings and conclusions made by MSHA in its investigation, but even then he mischaracterizes that evidence. Pfeiffer's central opinion is that MSHA determined that the strength and spacing between the components in the device were inadequate, thus causing the multimeter to fail. (Ex. A at 40). MSHA initially drew those conclusions, but – based on further laboratory testing by UL – MSHA's final report concluded that its preliminary conclusion "***is not correct and should be deleted***." (Ex. B at 20 (emphasis added)). Pfeiffer still clings to MSHA's deleted initial conclusion even though it has been disproven by UL's testing.[5] It will do nothing but confuse the jury to have Pfeiffer testify as if MSHA's preliminary conclusion is still valid, particularly since he did no testing of his own to

---

[5] Pfeiffer's strength of component theory was even further debunked by the study performed by ACS. (Ex. C at 7-8, 15 and App. I). Pfeiffer never asked for any testing, including the ACS study, and has not done (and cannot do) laboratory testing of his own. (R. 20 at 44:21–45:4, 47:12-22).

- 8 -

challenge laboratory testing by UL and/or ACS.  The MSHA Report speaks for itself and the jury can easily discern MSHA's relevant conclusions without interference from Pfeiffer.

This is particularly true given that Pfeiffer has not attempted to replicate the testing done by ACS, or by UL at MSHA's request.  Indeed, he did not even understand what the UL testing entailed, and thus ignored it completely when forming his own opinions.  (R. 20 at 159:3-25, 161:23–162:15).  No expert should be able to testify with such a grossly inadequate "methodology," and there is no sense in which this type of unsupported testimony by Pfeiffer could assist the jury.  Pfeiffer should not be permitted to testify merely to either parrot or baselessly reject MSHA's well-supported conclusions.

Other examples arise from Pfeiffer's failure to request or consider even basic factual information in the case, such as Plaintiff's deposition testimony.  How could it possibly assist the jury to have Pfeiffer testify to opinions that are directly contradicted by Plaintiff's own clear testimony that Pfeiffer did not even consider?  For example, how will the jury be helped by hearing Pfeiffer's causation theory which requires the multimeter to have been placed on top of the receptacle when, in fact, Plaintiff testified under oath and contemporaneously told MSHA that he placed the device below and to the side of the receptacle?  (R. 20 at 88:12-21, 111:16–112:4, 200:23–201:3 (admitting his theory fails if the device was not placed on top)).

Another example is Pfeiffer's insistence on testifying about his disagreement with the UL standard to the extent it talks about a 0.2 mm clearance between components.  He admits that none of the clearances at issue here are even close to 0.2 mm.  (*Id.* at 186:24–187:19).  Therefore, such testimony is completely irrelevant to the actual facts of this case.  The jury cannot possibly be assisted by testimony concerning a theoretical dispute with no actual impact on the claims at issue in this case.  (*Id.* at 187:17-19 (admitting "this is a theoretical disagreement with UL")).

DY47:45478:562053:3:LEXINGTON

Even worse, Pfeiffer's opinion about the UL 0.2 mm standard is still unformed because he purports to not understand what UL or MSHA concluded. (R. 20 at 184:4-24). Nor has he presented his unformed ideas about the UL standard UL61010-1 to anyone else for peer review. (*Id.* at 182:7-21). He hadn't even shared his objections with UL as of the time of his deposition. (*Id.* at 68:9–69:24). Pfeiffer's unformed (and uninformed) opinion brings to mind this Court's admonition that "[p]arties need not be allowed to bring in through the back door those issues which they were too late in bringing to the front." *Matilla v. S. Ky. Rural Elec. Coop. Corp.*, No. 6:04-380-DCR, 2006 U.S. Dist. LEXIS 2170, *9-11 (E.D. Ky. Jan. 20, 2006)). The jury cannot be assisted in any way by that type of improper testimony.

### 3. Pfeiffer's Methodology Is Unreliable and Does Not Fit the Facts.

As "gatekeeper," the court must ensure an expert's methodology is scientifically reliable and factually relevant, which "will require some objective, independent validation of the expert's methodology." *Smelser v. Norfolk & W. Ry. Co.,* 105 F.3d 299, 303 (6th Cir. 1997). Although trial courts may analyze a number of factors in assessing the reliability of expert testimony, the reliability analysis must also ultimately be "tied to the facts of the case." *Daubert*, 509 U.S. at 591. Pfeiffer's opinions are highly unreliable because they lack a valid scientific methodology and utterly ignore contrary facts and alternative causes.

#### a. Pfeiffer Did Not Employ a Valid Methodology.

The easiest way to understand Pfeiffer's "methodology" is to compare it to what an expert is expected to do in order to opine that a product is defective and unreasonably dangerous:

- Gather and analyze all of the relevant facts (Plaintiff's deposition, etc.)
- Gather and analyze any pre or post-accident third party testing on the device
- Gather and analyze any investigatory documents from governmental agencies
- Inspect the device

- Identify the proper methodology to test any theories about the device
- Conduct proper testing to validate any theories
- Form opinions based on solid facts and methodologically-sound testing

In this case, Pfeiffer performed bullet point No. 4 and gathered and analyzed MSHA's preliminary report. But that is it. He formed his opinions in this case without gathering obvious and crucial facts. He did not request or review Plaintiff's deposition. (R. 20 at 86:9-17). He did not even request to speak with Plaintiff informally. (*Id.* at 72:10-17). He did not request or review a single document from Southwire. (*Id.* at 74:7-10). Pfeiffer had in his possession the MSHA final report, but claims he did not understand UL's testing – so he ignored it. (*Id.* at 159:3-25, 161:23–162:15). He did not ask whether there had been any other post-accident testing on the device, such as documentation concerning the ACS testing that debunks his rating theory, or documentation concerning UL's post-accident testing that debunks his inadequate clearance theory. (*Id.* at 73:17–74:6). He did not request any pre-accident testing, such as the data from UL's certification of the device. (*Id.* at 172:18–173:21). He wants to criticize UL's post-accident testing, but did no testing of his own to determine whether the device could not handle its rating or whether the clearances were too small and could create an arc flash. (*Id.* at 182:1–184:24). Indeed, he admitted that he did not even have the laboratory capability to do such testing. (*Id.* at 47:12-22). Nor did he test whether humidity or dust could have penetrated the device and cause an arc flash. (*Id.* at 133:8-16, 134:7-16, 135:19–136:13). Indeed, he did not devise any methodology to test his theories. (*See generally* Ex. A).

The Sixth Circuit has identified lack of testing as a "red flag" that should strongly caution the gatekeeper against certifying an expert. *Newell Rubbermaid, Inc. v. Raymond Corp.*, 676 F.3d 521, 527 (6th Cir. 2012) (citing *Best v. Lowe's Home Ctrs., Inc.*, 563 F.3d 171, 177 (6th Cir. 2009)). The Sixth Circuit has repeatedly held that failure to test a hypothetical theory or

failure to test a proposed alternate design disqualifies a witness from testifying as an expert at trial. *See Johnson v. Manitowoc Boom Trucks, Inc.*, 484 F.3d 426, 432 (6th Cir. 2007); *Pride v. BIC Corp.*, 218 F.3d 566 (6th Cir. 2000); *Rose v. Truck Ctrs., Inc.*, 388 F. App'x 528, 535 (6th Cir. 1984); *see also Coffey v. Dowley Mfg., Inc.*, 187 F. Supp. 2d 958, 977 (M.D. Tenn. 2002).

Much like Pfeiffer's approach here, the expert in *Pride* performed a "failure analysis" on a device by conducting a visual examination of the device in question, taking photographs of it, and conducting a microscope examination of the device's parts. *Pride*, 218 F.3d at 571. However, he admitted that he did not perform any tests to duplicate his theory of the accident. *Id.* The Sixth Circuit affirmed his exclusion because he had not performed any reliable testing to support his theory, his theory contradicted laboratory tests performed by the defense's expert, and the evidence of the remains of the device in question contradicted his testimony. *Id.* at 578. *See also Rose*, 388 F. App'x at 535 (expert excluded in part because he admitted he had not tested his theory and could not even identify a test performed by someone else supporting his theory); *Johnson,* 484 F.3d at 432 (holding that because the expert "had made no attempt whatsoever to test" the feasibility of implementing his suggested changes in the specific crane at issue, the decision to "shut the gate" on his testimony was reasonable).[6] In the same fashion, Pfeiffer drew his conclusions from his examination of the device, but did no testing. His theories are directly contradicted by MSHA's final report and by actual laboratory testing performed by UL and ACS. Plaintiff's own testimony (which Pfeiffer did not consider) guts them as well.

Under this case law, Pfeiffer cannot give his causation and product liability opinions when he failed to do any testing of his own to validate his theories. *See, e.g.*, *Pride*, 218 F.3d at 576. Even worse, Pfeiffer cannot ignore testing by nationally recognized experts that totally

---

[6] Besides failing to test any of his theories, Pfeiffer additionally failed to even propose an alternative design. *See, e.g.*, *Toyota Motor Corp. v. Gregory*, 136 S.W.3d 35, 42 (Ky. 2004) ("[D]esign defect liability requires proof of a feasible alternative design.").

- 12 -

disproves his untested theories. *Tyree v. Boston Sci. Corp.*, 54 F. Supp. 3d 501, 558-59 (S.D. W. Va. 2014). Nor could it possibly be a valid methodology to rely on MSHA's preliminary conclusion without acknowledging that MSHA found it to be wrong based on UL's expert laboratory testing. Tellingly, Plaintiff's summary *Daubert* Response did not point to any testing done by Pfeiffer because there is none. (*See* R. 13). Plaintiff also acknowledged that Pfeiffer formed the opinions in his two reports prior to even understanding what he was challenging. (*Id.* at 2 (admitting "Pfeiffer was in the process of analyzing [the UL] standard to understand the underlying science behind the UL standard [but] [h]e has not been provided sufficient information or explanation as to why MSHA changed their opinion on the matter and has not been provided the UL report.")). This utter lack of testing critically impairs the reliability of Pfeiffer's testimony. *See, e.g.*, *Pride*, 218 F.3d at 576.

        **b.**       **Pfeiffer's Opinions Do Not Fit the Facts.**

An expert who ignores contrary data, misstates the findings of others, or makes sweeping statements with no support is not a reliable expert. *Tyree*, 54 F. Supp. 3d at 558-59; *Dwyer v. Sec'y of the Dep't of Health & Human Servs.*, No. 03-1202V, 2010 U.S. Claims LEXIS 86, at *589 (Fed. Cl. Mar. 12, 2010). For instance, in *Rose,* the court found that the evidence completely contradicted the expert's "assumption regarding the degree of tightness of the bolts on the steering gear." 388 F. App'x at 536. The Sixth Circuit held that because the expert relied on facts that were wholly contradicted by evidence, the trial court properly exercised its gatekeeping role by excluding the proposed testimony. *Id.*

Pfeiffer makes similar sweeping assumptions that are expressly contradicted by facts that he did not even consider prior to forming his opinions, the prime example being Plaintiff's own testimony. Key to his causation theory is Pfeiffer's ***assumption*** that Plaintiff set the multimeter on top of the receptacle, ***because that is the only factual scenario that supports his opinion.***

(Ex. A at 4; R. 20 at 111:16–112:4, 200:23–201:10). As noted above, however, Plaintiff contemporaneously reported to MSHA that he set up the multimeter "beside of the receptacle where I was going to get my voltage reading." (Ex. D at18). He emphatically testified the same in his deposition, and even recorded on a picture of the accident site that he set up the multimeter to the right and slightly below the receptacle. (R. 19 at 40-43; Ex. E). Plaintiff explained that his common practice is to set the meter to the side, as far away from the receptacle as the leads will permit, so that they do not get in the way. (R. 19 at 40-43).

Not only is Pfeiffer's theory factually inaccurate, but at the time he formed his opinions he had not even bothered to interview Plaintiff or even review Plaintiff's prior statements to ensure that his *assumption* about the placement of the multimeter was supportable. When he found out about his factual error at his deposition, Pfeiffer did not do what a real expert would do: retract his opinion. Rather, he clung to his opinion and claimed that Plaintiff must have been wrong. (R. 20 at 87:7-13, 201:4-10). He acknowledged that otherwise his theory would not hold water. (*Id.* at 88:12-21, 111:16–112:4, 200:23–201:3).[7] Because Pfeiffer's opinion is entirely based on conjecture and made-up "facts" with no support in the record, his theory of the accident is inherently unreliable. *Rose*, 388 F. App'x at 536; *see also Brainard,* 432 F.3d at 663-64 ("[A]n expert who supplies nothing but a bottom line supplies nothing of value to the judicial process.").

Similarly, Pfeiffer's opinion that the accident must have been caused by the ingress of humidity and dust into the device is highly speculative. (Ex. A at 40). Pfeiffer admitted that he did not visit the Excel Mine, and took no steps to determine the level of dust or humidity in the area where the accident occurred. (R. 20 at 126:9–128:5). Completely unaware of Plaintiff's contrary testimony, Pfeiffer incorrectly *assumed* the device was exposed to moisture and dust.

---

[7] Likewise, Pfeiffer's attempt to explain why—if his theory were correct—the test leads were not melted relies on utter conjecture as to what Plaintiff might have done. (*Id.* at 90:7–91:7).

- 14 -

(*Id.* at 137:9-24).  He compounded his error by failing to do any testing to determine whether *any* level of humidity or dust could have infiltrated the device.  *See, e.g.*, *Pride*, 218 F.3d at 576.

Most alarming, however, is the fact that Pfeiffer adopted MSHA's preliminary findings about clearance and rating issues, but utterly ignored that MSHA later rejected those findings once it reviewed laboratory testing performed at MSHA's request by UL.  (Ex. B at 20).  Pfeiffer's failure to take contradictory findings into account demonstrates the unreliability of his expert opinion.  *Tyree*, 54 F. Supp. 3d at 520 (explaining that "expert's opinion may be unreliable if he fails to account for contrary scientific literature.").

Pfeiffer's selective reliance on MSHA's earlier report was reportedly based on his disagreement with the UL standard used in reaching MSHA's final conclusion.  (R. 20 at 152:20–159:25).  But Pfeiffer does not even have a full understanding of UL's laboratory testing, and he did not do any independent testing to contradict UL's testing or its published standard that is heavily relied upon in the industry.  (*Id.* at 159:14–162:15).  In short, Pfeiffer ignored the facts of this case to reach conclusory opinions with no empirical support.

Did Pfeiffer gather all relevant facts and base his opinions on those facts?  No.  Did he bother to find out what Plaintiff testified about key facts?  No.  Did he request and analyze all third party laboratory testing on the device?  No.  Did he pay attention to facts and testing that gutted his opinions?  No.  Did he consider all of MSHA's testing and conclusions?  No.  Did he do any testing of his own to counter the findings of UL or ACS?  No.  Did he even fully form an opinion about UL's testing and MSHA's conclusion?  No.  Does his clearance opinion have anything to do with the actual clearances on this device?  No.  Did he fully consider alternative causes?  No.  Is he recognized as an expert in compliance testing or standards or product design or manufacturing?  No.  Pfeiffer's proffered opinions are outside the scope of his expertise and should be excluded because they lack a reliable methodology and do not fit the facts of this case.

        Respectfully Submitted,

        */s/ Daniel E. Danford*
        Daniel E. Danford
        Emily L. Startsman
        STITES & HARBISON, PLLC
        250 West Main Street, Suite 2300
        Lexington, KY  40507-1758
        Telephone:  (859) 226-2292
        Facsimile:  (859) 425-7909
        ddanford@stites.com
        estartsman@stites.com

        *Counsel for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that on June 24, 2015, a copy of the foregoing was served via the ECF system with service upon:

Lawrence R. Webster        websterlawrencer@bellsouth.net

        */s/ Daniel E. Danford*
        *Attorney for Defendant*